1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   ACLU, ET AL.,

4              Plaintiffs,

5        v.                    11 CV 3786 (RMB)

6   U.S. DEPT. OF HOMELAND
    SECURITY, ET AL.,
7
               Defendants.
8
    ------------------------------x
9                              New York, N.Y.
                               January 23, 2013
10                             9:10 a.m.

11   Before:

12              HON. RICHARD M. BERMAN,

13                       District Judge

14                   APPEARANCES

15   FRIED FRANK HARRIS SHRIVER & JACOBSON
         Attorneys for Plaintiffs
16   BY:  YONATAN JACOBS
         RICHARD TISDALE
17
     PREET BHARARA,
18       United States Attorney for the
         Southern District of New York
19   LOUIS A. PELLEGRINO
         Assistant United States Attorney

20

21

22

23

24

25

2

1        (In open court)

2        THE COURT:  So I've got your letter.  The letter is

3   dated January 7, as we had discussed at the last conference.

4        So I thought maybe just for sampling purposes we could

5   go through it and you could explain not each redaction as it

6   were, but so I could get a little bit of a better feel as to

7   what's being redacted or what is proposed to be redacted.

8        MR. PELLEGRINO:  Okay.

9        Thank you, your Honor.

10        Louis Pellegrino from the U.S. Attorney's Office on

11   behalf of the government.

12        As your Honor said when we last met, I think the main

13   task that we were asked to perform was we have informed your

14   Honor that there was sample POCR files in the possession of ICE

15   that we had reviewed and redacted.  And we told your Honor that

16   the sample we had had about 34 redactions or data points that

17   were at issue.  So we grouped those into what we call buckets,

18   which is, I think, what we discussed at the last hearing.

19   There's seven of those buckets listed on Page 2 of the letter

20   that we provided to your Honor.

21        And along with those seven buckets, there are four

22   FOIA exemptions that are associated with them.  Mostly they are

23   (b)(5), (b)(6), (b)(7)(C), and (b)(7)(E).  Some of those are

24   deliberative process or interagency review or interagency

25   records.  The remainder tend to deal with personal privacy

3

1   issues or law enforcement privacy.

2        THE COURT:  Go to the actual documents themselves and

3   let's just have a little sample run-through with you indicating

4   why there should be redaction.  This is without prejudice,

5   obviously, to the motion, and you saying why there should not

6   be -- all right.  Just so I get a feel.

7        So the first one is HQ POCR Checklist 241.4, right?

8        MR. PELLEGRINO:  That's the first page, your Honor,

9   yes.

10        THE COURT:  So let's just run through these redactions

11    and have a little discussion, again, without prejudice to the

12    motion.

13        MR. PELLEGRINO:  Okay.

14        Your Honor, I think the copy that you received is

15    highlighted; is that correct?  Okay.

16        THE COURT:  Yes.

17        MR. PELLEGRINO:  So we only need to be concerned with

18    the highlighted ones.  For example, the stuff on the top of the

19    page which is redacted are things that --

20        THE COURT:  Those are all (b)(7)(C).

21        MR. PELLEGRINO:  Correct, your Honor, (b)(6) or

22    (b)(7)(C).  And those are not being contested.

23        Just to briefly sum up, that's the alien's

24    biographical data.  And I think that nobody contests that

25    that's protected under the Privacy Act.

                                        4


1        THE COURT:  Is that right?

2        MR. TISDALE:  Correct, your Honor.

3        THE COURT:  So then you go down to probably the midway

4    point where there are (b)(5), (b)(6), and (b)(7)(C) exemptions

file:///C|/Documents/PDF/Exhibit%207%20-%20Transcript.TXT

5    again under the heading "Consular/Embassy Person Contacted."

6    Is that right?

7         MR. TISDALE:  Yes, your Honor.

8         THE COURT:  And you think that should not be included

9    again because?

10        MR. PELLEGRINO:  Well, that's an area that neither

11   party is contesting, but we have redacted it because under

12   (b)(7)(C), for example, it's potentially -- actually, under

13   both (b)(6) and (b)(7)(C) it is potentially protected.

14        If, for example, the consular embassy person for this

15   embassy, if that person's name is listed underneath that box,

16   there's no waiver for us to produce that person's personal

17   identifying information, and he or she is not part of this

18   case.  So that would be the reason that --

19        THE COURT:  No waiver from the person.

20        MR. PELLEGRINO:  Correct, your Honor.

21        THE COURT:  Okay.

22        MR. PELLEGRINO:  I think it is important to emphasize

23   that that no-waiver issue is important to everything that we're

24   looking at here.  For example, you could see that this

25   individual is from Liberia.  That's one of the things that we

5

1    did not redact.  We don't know that much more -- well, we do,

2    but plaintiffs don't know that much more about the identity of

3    this individual.  And we don't have a waiver from this

4    individual to produce his or her identifying information, so

5    the Privacy Act kicks in, and that's really what a lot of these

6    redactions are centered around.

7         THE COURT:  And then a little bit below that under the

8    heading HOTDU officer contacted.

9         MR. PELLEGRINO:  Yes, your Honor.  That one is the

10   name of an actual ICE officer.  Again, it would be protected

11   under (b)(7)(C).  There's no waiver to release that person's

12   information.

13        THE COURT:  And that is also not disputed; is that

14   right?

15        MR. TISDALE:  That's not disputed, your Honor.

16        THE COURT:  All right.

17        So here I guess we're coming to a dispute; is that

18   right?

19        MR. PELLEGRINO:  Correct, your Honor.

20        The No. 1 that's circled there, there's a box for

21   additional comments or information; we've redacted that and

22    listed some categories why we redacted it.

23          Here I think it's important to emphasize that this

24    POCR file that we provided your Honor is a sample.  And I have

25    the unredacted version here so that I can sort of look behind

                                    6

1     the redactions.

2           It's, in most cases, a pretty good sample.  There were

3     a few boxes that were redacted where there's actually nothing

4     behind them because we anticipated it in a different file there

5     would be something that would needed to be redacted.

6           In this particular case, I can say that what's been

7     redacted is the location and information regarding the alien's

8     probation officer and information about the alien's

9     probation -- the location that the alien needs to go to deal

10    with probation issues.  So that's what's been redacted in the

11    box labeled "additional comments or information."

12          THE COURT:  And why again?  Is that a privacy issue?

13          MR. PELLEGRINO:  Yes.  In part, if the probation

14    officer's name is revealed, that would be law enforcement --

15    (b)(6)(7)(C) information.

16          THE COURT:  Right.

17          MR. PELLEGRINO:  In addition, even if it's just the

18   location that the alien goes to meet with his or her probation

19   officer, our belief is that combined with other information, it

20   could reveal the identity of the alien, him or herself.

21          For example, you have a person from Liberia in this

22   sample.  The probation officer -- it's a location in the

23   southwest of the United States.

24          THE COURT:  For example, hypothetical, where?

25          MR. PELLEGRINO:  Hypothetically, Alabama or Texas.
                                    7


1           THE COURT:  Okay.

2           And what would be the problem with that?

3           MR. PELLEGRINO:  In and of itself, just the location

4    of probation may not be a problem.  If you take a country, say

5    Liberia or Albania or Estonia, one where you may have less

6    aliens from that location, and combine it with a probation

7    location in a state like, say, Alabama or Texas, then you have

8    a situation where you might be able to figure out who that

9    individual is because he or she may be the only person from

10    that country meeting with a probation officer at that location.

11          It's a sliding scale, but it's sort of a mosaic theory

12    that the agency has espoused.  And it's basically when there is

13    too much information regarding one person in the data here that

14    they believe that it needs to be protected.

15         THE COURT:  And what's your view?

16         MR. TISDALE:  Your Honor, Richard Tisdale; Fried,

17    Frank, Harris, Shriver & Jacobson for the plaintiffs.

18         Your Honor, our view is that this is a sort of broad

19    exemption.  Some of the data that Mr. Pellegrino stated, such

20    as the officer's name obviously we would not challenge.  But it

21    is our client's view in their experience that these comments

22    boxes a lot of times contain some information regarding the

23    likelihood of travel documents being issued.  So a blanket

24    exemption for this is not something that we feel is justified.

25         THE COURT:  So you don't care about not revealing the

                                    8


1    name or the location, but you think there might be more in the

2    comments.

3         MR. TISDALE:  Exactly, your Honor.

4         And the location we're not commenting on.

5         THE COURT:  So, for example, what might be there that

6    you would be looking for hypothetically?

7        MR. TISDALE:  Hypothetically, there might be a

8   discussion from one of the officers to the other saying that,

9   you know, we see issues with -- we see the following issues

10   with removal of this detainee.

11        THE COURT:  You mean why he should not be,

12   hypothetically, when someone writes there, This guy should

13   definitely not be removed because so-and-so.

14        MR. TISDALE:  Exactly, your Honor.

15        THE COURT:  And that's what you're trying to find.

16        MR. TISDALE:  Exactly.

17        THE COURT:  And would he be entitled to that

18   information?

19        MR. PELLEGRINO:  I think still our position would be

20   probably would not be.

21        A couple of responses to that, your Honor.

22        First, this is a particularly challenging box because

23   it just says "additional comments."  It could say anything.

24        THE COURT:  Right.

25        MR. PELLEGRINO:  Mr. Tisdale is probably right, there
                                   9


1   probably are situations where there might be that type of

2    commentary.  Although I would point out that later on, that

3    specific box does appear.

4         THE COURT:  On another document?

5         MR. PELLEGRINO:  Correct, your Honor.  You don't have

6    to turn to it now, but --

7         THE COURT:  I think I saw that.

8         MR. PELLEGRINO:  It could be listed there, as well.

9    And in that location we have indicated exemptions, as well.

10        Primarily, I think, our position would be that it's

11   interagency -- sorry, it's deliberative process; it's

12   predecisional.  It would be commentary about subordinates

13   making a recommendation to ICE headquarters about where this

14   alien should be taken or what should be done with respect to

15   travel documents.

16        THE COURT:  Which ultimately could be rejected.

17        MR. PELLEGRINO:  Correct, your Honor.

18        So I think generally under that scenario our position

19   would be that it would still be protected.  We've taken that

20   position with respect to the specific box that deals with that

21   issue.

22        THE COURT:  Do you want to comment further?

23        MR. TISDALE:  No, your Honor.

24        Just Mr. Pellegrino is right in that the deliberative

25   process exemption would probably be the one that we're most

                                        10


1   concerned about there and likely to challenge.

2        THE COURT:  I see.

3        All right.

4        Keep going.

5        Are there no more disputes on this document?

6        MR. PELLEGRINO:  On that page, correct, your Honor,

7   there are no more.

8        THE COURT:  On that page.

9        Is that right, counsel?

10        MR. TISDALE:  That's right, your Honor.

11        THE COURT:  That's the one that's -- the additional

12   comments is the one that you're most interested in or --

13        MR. TISDALE:  Correct, your Honor.

14        THE COURT:  Okay.  Got it.

15        MR. PELLEGRINO:  Turning to Page 2, your Honor.

16        This letter says decision to continue detention.

17   There's just one box that's at issue, that's the circled No. 2.

18    We've labeled it (b)(6)(7)(C), personal privacy.

19        This is actually the same issue as we talked about on

20    the previous page.  It's actually the same information as the

21    additional comments or information box.

22        Looking behind the redactions on my unredacted

23    sample --

24        THE COURT:  In your sample, what is it, the name of a

25    person?

                                        11

1        MR. PELLEGRINO:  It is, your Honor.  It's a letter

2    addressed to the detention officer -- excuse me, the probation

3    officer, and the address of the probation location.

4        THE COURT:  Okay.

5        MR. PELLEGRINO:  So our position would be the name of

6    that person would be protected, while the location might not

7    always be protected in and of itself.  We think under the

8    mosaic theory it could reveal the personal identifying

9    information of this particular alien.

10       THE COURT:  And you would challenge it by?

11       MR. TISDALE:  Your Honor, we feel that the probation

12    location and -- I was thinking that this box was also the

13    detainee facility.  And it is our belief that that is not

14    protected information and we would challenge that.

15         THE COURT:  So you're looking for the facility where

16    the --

17         MR. TISDALE:  Yes, your Honor.

18         MR. PELLEGRINO:  Actually, yes, this one is -- the

19    address is the detention facility; it's similar to the

20    probation address.

21         But our rationale is the same:  It's that the location

22    of where this alien was detained, the facility, could reveal

23    who that person is, if he or she is the only Liberian, the only

24    Estonian or Albanian or some country in which it would be

25    uncommon to have more than one person at that facility or just

                                 12


 1    a few people.  We think there's enough identifying information

 2    in this file that's not redacted that in a situation like that

 3    you would be able to determine who the person is.

 4         MR. TISDALE:  And, your Honor, we feel that the

 5    detaining facility is a basic piece of information.  To say the

 6    least, at this point, we're skeptical of the mosaic theory that

 7    we'd be able to put in pieces of information together to

8    identify certain individuals.

9         THE COURT:  And what ultimately then though are you

10   trying to figure out?

11        MR. TISDALE:  Well, our client uses this information

12   for advocacy.  And this piece of information helps them to --

13   and it helps their database people to see patterns of where

14   people are detained and where they're from.  And what they do

15   when they collect the data is sort of compare people in this

16   detaining facility in, say, Maine, and people in the detaining

17   facility in Arizona.  And then their database people use that

18   for patterning.

19        THE COURT:  And how does that help you?  So if there

20   are ten in Maine and six in Arizona, whatever?

21        MR. TISDALE:  Well, there's a certain detainee

22   facility that has what would be like an above average from a

23   certain country that could be useful to our client for their

24   advocacy.

25        THE COURT:  And you want to know if there is such.

                          13



1         MR. TISDALE:  Right.  Exactly, your Honor.

2         THE COURT:  So that there are, what, more than average

3   number --

4        MR. TISDALE:  Right.  If there's a detainee facility,

5   for example, where people are being -- let me just step back

6   for a second, your Honor.

7        Part of what our client wants to really figure out is

8   if people are being detained longer than they are supposed to

9   be detained.

10       THE COURT:  Right.  Okay.

11       MR. TISDALE:  If there is an overabundance, above

12   average, in a certain facility, that could mean there could be

13   potential problems with the way that that office is processing

14   detainees that our client would care to know about for

15   advocacy.

16       THE COURT:  So hypothetically, to take Arizona, if

17   there are too many, in your opinion, from one country in a

18   facility, how would that help you?

19       MR. TISDALE:  That, I think, would help our client's

20   database people determine whether that facility is processing

21   detainees or holding them longer than the other detention

22   facilities in other parts of the country.

23       THE COURT:  Is there no way to get that information

24   other than this way?

25          MR. TISDALE:  I am not fully -- I can't answer that,
                              14


1    your Honor.

2          MR. PELLEGRINO:  Well, your Honor, I think --

3          THE COURT:  Do you care that he would know that, for

4    example?

5          MR. PELLEGRINO:  Do we care, your Honor?

6          THE COURT:  Yes.

7          MR. PELLEGRINO:  I don't think generally --

8          THE COURT:  I mean what if Arizona Facility X, for

9    example -- I'm not exactly sure who the population is, but he's

10   trying to determine that they hold onto the people longer than

11   the facility in Maine, and maybe that suggests that that

12   facility is not processing these people quickly enough.  Is

13   that your concern?  Did I get that right?

14          MR. TISDALE:  Yes, your Honor.

15          MR. PELLEGRINO:  I'm not sure it would prove the

16   point, only because a facility in Arizona, which is on the

17   border, may contain a component, a higher percentage of people

18   from certain Latin-American countries than other countries.

19   Anyway, whether they've been detaining those people longer or

20   not is a different question.

21        THE COURT:  Would you have any trouble revealing to

22   him the average length of detention in your various facilities

23   without -- I mean you may have very good reason why the number

24   differs, but do you care if he knows that?

25        MR. PELLEGRINO:  On that specific question, I'd have
                              15


1   to ask ICE.  But I would mention that one of the things we

2   thought we resolved with the other three requests in this

3   lawsuit, or that big data production that we did back in the

4   summer and fall in this case was that we thought we answered

5   the question of how many people we had that had been detained

6   more than six months and had not been detained more than six

7   months.

8        THE COURT:  And did you tell them also in that where

9   they were?

10        MR. PELLEGRINO:  I don't believe -- do you recall

11   those by facility?

12        MR. TISDALE:  I don't recall that.

13        THE COURT:  I mean that would answer your question if

14   he did, right?

15          MR. TISDALE:  Right.

16          THE COURT:  If he told you that.  That would get you

17   the information that you're suggesting --

18          MR. TISDALE:  Yes, your Honor.

19          But there could be other reasons that our client wants

20   the detainee facility.  Because when they, I think, do their

21   patterning, it helps to have a sort of basic set of data as

22   they use one patterning pool to the next.  And they have told

23   us that one of the key pieces of data for them to use in their

24   other models is the detainee facility.

25          THE COURT:  I see.
                              16


1    And you certainly know those facilities now, right?

2          MR. TISDALE:  Yes, your Honor.

3          THE COURT:  So you don't want to just know the

4    facility; you want to know more about the facility.  And

5    specifically, you want to know length of detention?

6          MR. TISDALE:  Yes, your Honor.

7          THE COURT:  At the facility.

8          MR. TISDALE:  Yes, your Honor.

9          THE COURT:  To compare one with the other?

10        MR. TISDALE:  Yes, your Honor.

11        MR. PELLEGRINO:  I think that's in the data we

12   provided, your Honor.

13        THE COURT:  I was trying to think -- I'm not as

14   conversant with what was provided, but it just strikes me that

15   the issue would be surprising if that were not controversial,

16   but if that were not available, I think.

17        MR. PELLEGRINO:  In the data we did provide -- one of

18   the categories was detention facility.  And the comment on that

19   was ICE will identify the detention facility where the alien

20   was held on the date of issue.  So we did, in the spreadsheets

21   that we provided --

22        THE COURT:  They know the facilities.

23        MR. PELLEGRINO:  -- we did list the facility, and we

24   listed the length of time that the person was held at the

25   facility, if it was greater than six months.  And there were

                         17


 1   like 19 other data points that we provided.

 2        THE COURT:  So would one response to your -- or to his

 3   objection or however this gets phrased was that you already

 4   have that material?  Might you say in a motion, if we get to

5    motion practice, that --

6        MR. PELLEGRINO:  I think we would say that, your

7    Honor.  I think the response from them -- and I think the issue

8    might be, Well, they're probably interested in knowing about

9    this alien and what facility that this alien is at.  And our

10   position with respect to that is that's still a Privacy Act

11   problem; because although ACLU wants to represent these people,

12   they don't have waivers -- they don't have a waiver from this

13   individual that allows them to get that info.  That's really

14   the problem for everybody, I think, in dealing with the issue.

15       THE COURT:  I got it.

16       MR. PELLEGRINO:  But for the Privacy Act, we wouldn't

17   have a problem providing the data, but we're concerned about,

18   A, basically getting sued from somebody else saying, You

19   released my info and I didn't give you permission to do that.

20       THE COURT:  Right.

21       MR. TISDALE:  And, your Honor, I just want to say

22   these are letters of decisions to continue detention, and

23   that's what makes the data probably a little bit different than

24   what has been provided already.

25       THE COURT:  Okay.

18

1        So let's take another couple and just so we get a

2   feel.

3        So I take it on the next page there is no dispute.

4        MR. PELLEGRINO:  Correct.

5        MR. TISDALE:  Correct, your Honor.

6        MR. PELLEGRINO:  That's correct.

7        THE COURT:  And then on the post-order custody review

8   worksheet, there are several.

9        MR. PELLEGRINO:  That's right.

10       THE COURT:  So let's just go through those, and

11  perhaps the page after that.

12       So this document is post order, meaning post-order of

13  detention?

14       MR. PELLEGRINO:  I think that's correct.

15       THE COURT:  Is that what that means?

16       MR. TISDALE:  I think that's what that means, your

17  Honor.

18       THE COURT:  So a detention order has been issued.

19       MR. TISDALE:  Exactly.  Yes, your Honor.

20       THE COURT:  And then there's something called a

21   custody review.  And the custody review asks these questions,

22   as it were, or seeks this information.

23        Okay.

24        And then the first objection, it looks like, is at the

25   date of last arrival.  And it does tell the place of birth.  It

                                    19


1    doesn't tell the date of birth, doesn't tell the name; but it

2    says the date of last arrival, and that's objected to.  And

3    also the place of arrival is objected to.  So let's say that's,

4    what, New York, January 12, 2000?

5         MR. TISDALE:  We could use that as an example, your

6    Honor.

7         THE COURT:  Hypothetical.  Right.

8         And you object to that because -- I mean you don't

9    want to give that information because?

10        MR. PELLEGRINO:  If it were New York, maybe it's not

11   as much of a problem.  But if it were that border crossing in

12   Vermont that's very small or Fort Hancock, Texas, and this

13   individual, as we know, is Liberian, and you have both the date

14   of the last arrival to the United States and the place of

15   arrival, which can be very specific, and in this case it's not

16    New York, it's actually a location that we think would be more

17    unusual for a Liberian to enter the country, then, again, it

18    goes back to revealing personal identifying information.  In

19    every case, I mean, you know, if the individual is from a

20    country that came through the Port of New York, and, you

21    know --

22         THE COURT:  No problem, right?

23         MR. PELLEGRINO:  Right.

24         But that's not always the case.  And sometimes they

25    cross the border at very specific points in small towns in the

                                   20


1    southwest or sometimes through Canada, as well.  So that's

2    really the issue here and that's why we've redacted it.

3         And the date of arrival is very specific.  I mean that

4    really nails it down in terms of when that alien entered the

5    United States, and may allow you to figure out who that person

6    is.

7         MR. TISDALE:  Your Honor, again, we are skeptical of

8    the mosaic theory, and it is not our client's intention to

9    personally identify the individuals in these POCR files.

10         Regarding the Exemptions 3 and 4 on this page, the

11  date of the last arrival, it's a key piece of information for

12  looking at whether someone has been detained longer than they

13  should be detained.  And so that is sort of basic information

14  that the client would need to figure out.  And the place of

15  arrival, again, is just another key piece of data that will

16  help our client determine whether they see any irregularities

17  across the regions.

18      THE COURT:  So would it help -- could you give him the

19  year as opposed to the date?  All he's interested in really is

20  figuring out length of detention.  So year would be a little

21  imprecise.  Would that satisfy you?

22      MR. TISDALE:  I'd have to talk to our client.  They

23  might want the month, as well, because a lot of the timelines

24  are measured in months.

25      MR. PELLEGRINO:  I'd have to talk to my client also.
21

1  I mean it gets into a fuzzy area.

2      I think a year probably would be okay if we're not

3  joining that to the place of arrival, as well.  As I mentioned,

4  with this individual, it's a little bit of a unique place, it's

5  not New York, the date is specific, we have the exact date.

6        THE COURT:  Right.

7        And when you say "unique," so how would you

8    distinguish -- obviously New York has the most arrivals, I

9    would imagine, or among the most.  And so it would be pretty

10   hard to figure out who somebody is who arrived in New York

11   because there are so many.

12       MR. PELLEGRINO:  I think that's probably right, your

13   Honor.

14       THE COURT:  So are there points of arrival where

15   they're more like New York, than -- I can't think of -- give me

16   an example where other than New York it would be so easy to

17   identify who arrived.

18       MR. PELLEGRINO:  One example in this hypothetical

19   would be take a Liberian, who is originally an African, someone

20   from Africa, entering through Mexico and crossing the border at

21   a small location in Arizona.  That would be unusual because

22   there would have to be -- it would be unusual for somebody from

23   Africa entering the United States through that route.

24   Presumably that person did that by first applying to Mexico or

25   somewhere in Latin America and traveled north.  That's sort of

22

1    an unusual circumstance.

2          The other situation could be --

3          THE COURT:  But how is anybody going to figure out who

4    that person is?

5          MR. PELLEGRINO:  Well, Mr. Tisdale said, Look, my

6    client is not looking to reveal who these people are.

7          THE COURT:  Right.

8          MR. PELLEGRINO:  But our concern is not what ACLU is

9    going to do necessarily, except that ACLU often publishes this

10   data or provides it to law professors and other people who

11   publish the data.  And then this Liberian national may see that

12   data and say, That's me.  I'm probably the only person who

13   crossed the border into Arizona who's a Liberian in, you know,

14   1994; and it's pretty apparent now as I go through the rest of

15   this information that ICE released my personal data.  And

16   that's the concern there.

17         The other location that could be an issue, is there

18   could be inland locations.  Someone might fly to Cincinnati or

19   some city where they just caught a flight, a direct or

20   something, from whatever country they originated in.  And that

21   would also be unusual.  And there are inland locations where

22   aliens are detained across the U.S.

file:///C|/Documents/PDF/Exhibit%207%20-%20Transcript.TXT

23      MR. TISDALE:  Your Honor, just because there could be

24   unusual circumstances, in our view, that doesn't mean that

25   you're revealing personal privacy information.  Just because

                                23

1   there are rare events indicated, we don't think that allows

2   people to peer behind that and determine the person's identity.

3       THE COURT:  I got it.  Okay.

4       And then on that same page, the ICE location detained

5   and DCO.  What is DCO?

6       MR. PELLEGRINO:  I'm not sure what DCO stands for,

7   your Honor.  But what that box reflects is the same information

8   we already looked at, that address on --

9       THE COURT:  Could it be the custody officer?

10      MR. PELLEGRINO:  I think that's probably who the DCO

11   is, yeah.  That's the detention center location of where the

12   alien is detained.  It's actually the same information that we

13   had discussed before.

14      MR. TISDALE:  Yes, your Honor.  I believe we discussed

15   that.

16      THE COURT:  I see.  Okay.  I got it.

17      All right.

18        Just do one more page.

19         So here, 6.  And I think I understand why Mr. Tisdale

20   wants this information.  It's sort of a catchall, and it's

21   called immigration history.  So you're thinking, Mr. Tisdale,

22   that who knows what's going to be mentioned in there.

23         MR. TISDALE:  Exactly, your Honor.

24         And some of the charges that the individuals had been

25   arrested on is information that our client is interested in

                                24


1   this.

2         THE COURT:  Which could be discussed in a box like

3   that.

4         MR. TISDALE:  Exactly.  We believe it would be

5   discussed in this box.

6         THE COURT:  Because it says ICE arrests, parole bond,

7   custody information, adjustment.

8         Okay.  Got it.

9         And you don't want to give that up because?

10         MR. PELLEGRINO:  I mean I think it's good we're

11   looking at this one, your Honor, because this -- I think we're

12   getting into the heart of some -- these larger boxes that you

13   see redacted are some of the ones that we have the most trouble

14   with redacting.  For one, they could be the most varied.

15          But this example contains quite a bit of data about

16   this alien.  He or she has entered the United States more than

17   once; he or she did enter it in New York City at one point, and

18   then entered in a totally different location in the United

19   States.  There's a lot of data about exactly when those dates

20   were, when he or she was taken into custody, by which state's

21   law enforcement agency that did that.  So this data is

22   extremely detailed.

23          Just looking at this redacted box on Page 5, you could

24   determine who that person is because there's probably no other

25   person that has precisely that history that's set forth there.

25

1   So that's the reason that we've redacted it.

2          THE COURT:  Okay.

3          Let's do 7 and 8 on the next page, criminal history.

4          MR. PELLEGRINO:  Seven and 8 are similar.  This is the

5   alien's criminal history.

6          This one here, for example, has a very specific

7   criminal history.  The person was convicted of an offense that

8    if it were revealed, I think it would be probably pretty clear

9    who this person was.  You could probably piece together the

10   data, particularly if you had date of entry, location of entry,

11   detention facility, and then you had this criminal history.

12          THE COURT:  And origin.

13          MR. PELLEGRINO:  Correct, your Honor.

14          MR. TISDALE:  And, your Honor, we do not think that

15   their offense would be protected under FOIA.

16          THE COURT:  Because it's public information?

17          MR. TISDALE:  Exactly, your Honor.

18          THE COURT:  Okay.

19          It probably is, right, public information?

20          MR. PELLEGRINO:  It is; although I mean this is

21   located in a system of records in the government.  Just like an

22   FBI record can't produce an FBI docket sheet without a

23   legitimate law enforcement purpose or somebody's personal

24   privacy waiver.

25          So I think our position would be it is public; and if

                                          26


1    you knew who the person was, you might be able to go look it

2    up.  But without a waiver for us to just release it like that,

3    it would still be a Privacy Act problem.

4        THE COURT:  All right.

5        Are there any other samples that we should go through

6    you think that would be helpful to me from your point of view?

7    Or is that -- have we sort of --

8        MR. PELLEGRINO:  I think in terms of the buckets, your

9    Honor, I think we've covered a lot of them.

10        Buckets 6 and 7 deal with medical concerns; it's

11    special circumstances.  We can look at those or not, but we can

12    just briefly -- I mean our position there is, again, those

13    would be protected -- the medical concerns would be protected

14    by the Privacy Act.

15        I can't remember if this individual had medical

16    concerns or not.  One of the things we would need to do,

17    because it's a check box, we probably have to redact that box

18    for everyone's file; otherwise, if you only redact it when

19    there's a check, you know that the person has medical issues.

20    So that was something we had redacted.

21        And then the last one, special circumstances, national

22    security concerns, that one deals with people are sometimes

23    brought here for national security reasons.  People are

24    sometimes detained for national security reasons, like they're

25    a material witness to an act of terrorism, something of that

                                    27


1    nature.  And we believe that if that were to be present, it

2    would need to be redacted.

3          THE COURT:  I see.  Okay.

4          All right.

5          Any other boxes that you want to discuss?

6          MR. TISDALE:  No, your Honor.

7          THE COURT:  No.  Okay.

8          All right.

9          Well, that's pretty helpful to me.

10          So now we need a motion schedule, I guess.

11          So what I would typically do, and I think we may have

12    discussed this before, instead of making cross-motions, I

13    always prefer to have one party move, the other party to

14    respond, then there would be a reply.  And if there needs to be

15    a surreply, I don't usually have a problem with that.

16          So have you thought about that, who wants to --

17          MR. TISDALE:  Your Honor, we were thinking that -- we

18    have thought about that.  That sounds fine for the ACLU.  I

19    believe it is fine for the government, but I'll let them

20    answer.

21         And we talked with the government, and we thought it

22    made sense for the ACLU to submit their brief first and move

23    first.

24         THE COURT:  Okay.

25         And how much time do you want for that?

                              28


1          MR. TISDALE:  Your Honor, we would like to be able to

2    submit our initial brief in five weeks.

3          THE COURT:  So that would be when?

4          MR. TISDALE:  February 27th.

5          THE COURT:  And then when did you want to respond?

6          MR. PELLEGRINO:  March 3rd, your Honor, for our

7    response, for the government's response.

8          THE COURT:  Okay.

9          And then did you contemplate a reply?  And, if so, by

10   when?

11         MR. TISDALE:  Two weeks from March 3rd.

12         THE COURT:  Christine tells me March 3rd --

13         MR. TISDALE:  Sorry.

14        THE COURT:  You want to make it March 4?

15        MR. PELLEGRINO:  Sorry, what was the 3rd?

16        THE DEPUTY CLERK:  Sunday.

17        MR. PELLEGRINO:  Oh, Sunday.

18        THE COURT:  That's a week after his motion, March 4.

19        MR. PELLEGRINO:  April 3rd would be --

20        THE COURT:  For the government's response is April

21   3rd?

22        MR. PELLEGRINO:  That's right.  Otherwise it would

23   give us like five days.

24        THE COURT:  Right.

25        MR. PELLEGRINO:  Okay.
                              29


1         THE COURT:  And then a reply.

2         MR. TISDALE:  On April 17, two weeks from then.

3         THE COURT:  And did you contemplate a surreply?

4         MR. PELLEGRINO:  May we see where we are on that?

5         THE COURT:  Yes.

6         So let's say we'll leave it optional.  And but if you

7   did do it, when would you want to do it by?

8         MR. PELLEGRINO:  I think two weeks would be

9   appropriate, like the reply.

10        THE COURT:  So that's May 1st.

11        MR. PELLEGRINO:  Okay.

12        THE COURT:  Typically, we have page limits.  And since

13   you've narrowed things down, probably those page limits for

14   summary judgment would work here.  So let's try and see if we

15   can't honor the page limits.

16        MR. PELLEGRINO:  Is that 25 and 10, your Honor?

17        THE COURT:  I think that's what it is, yes.

18        MR. PELLEGRINO:  Okay.  We'll check your rules.

19        THE COURT:  And this would be done on submission?  It

20   sounds like the kind of thing that is pretty straightforward.

21        Why don't we say it will be on submission, unless

22   there are issues that I would like some more clarification, and

23   then I would call you in for brief oral argument.

24        How about that?

25        MR. PELLEGRINO:  That's fine, your Honor.
                                30


1        MR. TISDALE:  Fine, your Honor.

2        THE COURT:  Okay.

3        So this has been helpful.

4          Thanks.

5          Did you want to add anything to our discussion?

6          MR. TISDALE:  No, thanks, your Honor.

7          MR. PELLEGRINO:  Thank you, your Honor.

8          THE COURT:  Okay.  Great.

9          Nice to see you.

10          MR. PELLEGRINO:  Thank you, your Honor.

11          MR. TISDALE:  Thank you, your Honor.

12                    *   *   *

13

14

15

16

17

18

19

20

21

22

23

24

25